IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LEXINGTON INSURANCE COMPANY,           )
                                       )
            Plaintiff,                 )
                                       )
vs.                                    )        Civ. No. 07-464 RB/LAM
                                       )
NEW MEXICO ASSOCIATION OF              )
COUNTIES and DOÑA ANA COUNTY           )
BOARD OF COMMISSIONERS,                )
                                       )
            Defendants.                )


MEMORANDUM OPINION AND ORDER

THIS MATTER came before the Court on the parties' cross motions for summary judgment. Having reviewed the parties' arguments and considered the pleadings, affidavits, depositions, answers to interrogatories, and other documents accompanying their memoranda, the Court hereby grants in part and denies in part Lexington's Motion for Summary Judgment (Doc. 74) and grants in part and denies in part Defendants' Motion for Summary Judgment. (Doc. 75.)

I.      INTRODUCTION & PROCEDURAL BACKGROUND

        This suit arose out of the parties' dispute over the duty of Plaintiff Lexington Insurance Company (Lexington) to provide benefits to the insured Defendants for a settlement in the case of *Lira v. Doña Ana County Board of Commissioners*, USDC DNM No. Civ. 06-0179 WPJ/WPL (*Lira*). Lexington filed a complaint (Doc. 1) on May 11, 2007, asking the Court to enter a declaratory judgment that it has no duty to indemnify Defendants or provide defense costs under the

parties' insurance contract.[1]  Defendants filed an answer and counterclaim (Doc. 10) on August 20,

2007.  The parties filed cross motions for summary judgment (Docs. 74 & 75) on February 12, 2010.

## II.     STATEMENT OF FACTS

Jesus Lira and other current and former detainees at the Doña Ana County Detention Center

brought a class action lawsuit against the Doña Ana Board of Commissioners, and others, alleging

violations under 42 U.S.C. § 1983 and the New Mexico Tort Claims Act.  The complaint alleged

that from March 3, 2003 to March 7, 2006 "strip searches of the named Plaintiffs were undertaken

pursuant to a blanket and indiscriminate policy of strip searching detainees processed at the

[Detention Center]." (*Lira* Compl. ¶¶ 41, 45.)

When Defendants notified their insurance providers of the lawsuit, Lexington responded that

the claims were not covered.  Defendants' first layer of coverage was provided through the New

Mexico Association of Counties (NMAC).  The NMAC is a non-profit organization that operates

the Multi-Line and Law Enforcement Pools (NMAC Policy), which provide liability insurance for

Doña Ana County and other New Mexico member counties.  Defendants also had a reinsurance

policy through County Reinsurance Limited.  Finally, Lexington provided Defendants with a

following form excess liability insurance policy (Lexington Policy) for claims exceeding their

primary coverage.  A following form policy provides the same coverage as the underlying policy,

unless coverage is specifically modified or excluded in the policy.

Following two days of mediation on May 14–15, 2007, in which Lexington participated,

---

1.  In its complaint (Doc. 1), Lexington also asked for declaratory relief in the case of *Rodriguez v. Doña Ana County Board of Commissioners*, USDC DNM No. Civ. 06-416 JCH/CG. The *Rodriguez* complaint involved similar allegations, but the strip searches were of minors.  A settlement was reached in the *Rodriguez* case on October 16, 2007.  As part of the settlement, the parties agreed to consolidate the case with the *Lira* action, and an order consolidating the two cases was filed on November 21, 2007.  Lexington no longer requests declaratory relief in *Rodriguez* because the settlement amount in that case did not reach the Lexington Policy's layer of coverage; therefore, the Court will only analyze Lexington's request for declaratory relief with regard to the *Lira* settlement.

Defendants reached a settlement for $5,000,000. Although Lexington asserted that the *Lira* claims were not covered, it agreed to a 50/50 funding of that portion of the settlement in excess of the Defendants' primary coverage and to resolve the coverage dispute through a declaratory judgment action. (Mutual Reservation of Rights, Doc. 74-2, p. 18.) Accordingly, Lexington and Defendants each paid $1,325,000 toward the $5,000,000 settlement.

Lexington requests that the Court find the Lira plaintiffs' claims are not covered by its policy and grant its motion for summary judgment. Defendants request that the Court find the *Lira* claims are covered and grant their motion for summary judgement. Additionally, Defendants request that the Court find Lexington liable for violating the New Mexico Insurance Practices Act, for breaching their insurance contract, and for breaching its duties of good faith and fair dealing owed to NMAC and order Lexington to pay punitive damages and Defendants' attorneys' fees and costs.

## III.    STANDARD OF REVIEW

### A.    Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the non-moving party." *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Serv.*, 165 F.3d 1321, 1326 (10th Cir. 1999). "Evidence is sufficient to withstand summary judgment if it is significantly probative and would enable a trier of fact to find in the nonmovant's favor." *Adams v. Am. Guarantee and Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

### B.    Choice of Law

The Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1332 (diversity

jurisdiction).   In diversity cases, the substantive law of the forum state—in this case, New Mexico—governs the analysis of the underlying claims. *City of Hobbs v. Hartford Fire Ins. Co.*, 162 F.3d 576, 581 (10th Cir. 1998).   Under New Mexico law, an insurance policy must be construed according to the contract law of the place where the contract was entered into. *Shope v. State Farm Ins. Co.*, 122 N.M. 398, 400, 925 P.2d 515 (N.M. 1996).   Accordingly, the Court must apply New Mexico law in interpreting the insurance policies in this case.

### C.      Contract Interpretation

"The interpretation of an insurance contract is a matter of law about which the court has the final word." *Rummel v. Lexington Ins. Co.*, 123 N.M. 752, 766 (1997).   Insurance contracts are interpreted using the same principles employed to interpret other types of contracts. *Id*. at 758.   In interpreting insurance contracts, Courts frequently encounter ambiguities.   "Ambiguities arise when separate sections of a policy appear to conflict with one another, when the language of a provision is susceptible to more than one meaning, when the structure of the contract is illogical, or when a particular matter of coverage is not explicitly addressed by the policy." *Id*.   The Court should first attempt to construe the insurance contract as a whole, giving words their usual and natural meaning. *Id*.   If the ambiguities are still not resolved, the Court may then look to extrinsic evidence. *Id*. at 759.   The Court's construction must be guided by the reasonable expectations of the insured. *Id*.

## IV.     ANALYSIS

### A.      Policy Exclusions

The Court begins with a review of the underlying causes of action asserted in the *Lira* complaint and an analysis of the relevant provisions and exclusions of the Lexington and NMAC policies to determine the scope of coverage. *See Bernalillo County Deputy Sheriffs Ass'n v. Count of Bernalillo*, 114 N.M. 695, 697 (1992) ("In deciding whether an insurer is obligated to defend the

insured, we must determine whether the injured party's complaint states facts that bring the case within the coverage of the policy.").

1.      *Section 1983 Civil Rights Claims*

The *Lira* plaintiffs' first cause of action alleges civil rights violations under 42 U.S.C. § 1983. (*Lira* Compl. ¶¶ 55–61.)  The *Lira* complaint names as defendants the Doña Ana County Board of Commissioners and several Doña Ana County Detention Center administrators.  The complaint alleges Defendants violated plaintiffs' civil rights by failing to "properly create, adopt, inculcate and ensure compliance with appropriate policies and procedures for corrections officers and supervisory personnel"; by failing to "properly train, monitor, supervise and discipline corrections officers and supervisory personnel"; and by failing to "otherwise institute and ensure compliance with adequate procedures and policies that would protect the rights of Plaintiffs and class members." (*Lira* Compl. ¶ 58.)  Lexington argues that it has no duty to provide coverage for the alleged violations under its policy because, for a municipality to be found liable for civil rights violations under § 1983, it must have acted intentionally or with deliberate indifference; therefore, the plaintiffs injuries were "expected or intended from the standpoint of the Insured" and excluded from coverage under the policy's exclusionary definition of "occurrence." (Doc. 101, p. 10.)

Several New Mexico courts have concluded that similar clauses excluding "expected or intended" injuries from coverage serve to exclude intentional torts; however, they have not addressed whether civil rights violations are also excluded. *See, e.g.*, *Knowles v. United Servs. Auto. Assoc.*, 113 N.M. 703, 707 (1992) (limiting coverage for intentional torts where the "actor desires to cause the consequences of his act, or [where] he believes that the consequences are substantially certain to result from it" (quoting RESTATEMENT (SECOND) OF TORTS § 8A (1965))); *Computer Corner, Inc. v. Fireman's Fund Ins. Co.*, 132 N.M. 264, 267–68, 46 P.3d 1264, 1267–68 (N.M. Ct.

5

App. 2002) (finding expected or intended phrase excluded intentional acts from coverage).  In *Knowles*, the New Mexico Supreme Court concluded the phrase excluded coverage for those acts resulting in harm of the same general type that may be expected or intended to result from one's actions. 113 N.M. at 707.  This is similar to the standard for municipality and supervisor liability under § 1983:  to hold a municipality or supervisor liable under § 1983 for a failure to adopt or implement a proper policy, a plaintiff must show that the defendant acted intentionally or with deliberate indifference with regard to the constitutional rights of the plaintiff. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694–95 (1978); *Jenkins v. Wood*, 81 F.3d 988, 994–95 (10th Cir. 1996).  In other words, the defendant must have "expected or intended" a violation of the plaintiff's constitutional rights to occur.  Accordingly, a finding that an "expected or intended" exclusionary clause in a policy may bar § 1983 violations from coverage appears consistent with the New Mexico Supreme Court's reasoning in *Knowles*, 113 N.M. at 707.  In *Knowles*, the Court did note, however, that the "cases are split as to whether or not, as a matter of law, such clauses are ambiguous." 113 N.M. at 706.

Thus, the Court's analysis cannot end here; assuming that an "expected or intended" exclusionary clause can function to bar § 1983 claims from coverage, we must now determine whether the exclusionary clause in the case at hand is ambiguous or irreconcilably conflicts with other parts of the agreement contrary to New Mexico's strong policy of promoting the reasonable expectations of the insured. *See Knowles*, 113 N.M. at 707; *Rummel*, 123 N.M. at 764; *Federal Ins. Co. v. Century Federal Savings & Loan Assoc.*, 113 N.M. 162, 169 (1992); *Safeco Ins. Co. v. McKenna*, 90 N.M. 516, 518 (1977).  Defendants argue that the definition of "occurrence" cannot function to exclude the *Lira* plaintiffs civil rights claims from coverage because, as a following form policy, the Lexington Policy must follow the terms of the NMAC Policy, which clearly conflicts

6

with Lexington's interpretation of the clause. *See Coleman Co., Inc. v. California Union Ins. Co.*, 960 F.2d 1529, 1531 n. 1 (10th Cir. 1992) ("An excess policy covering the same risks that are covered by the underlying policy is known as a 'following form' policy."); *Rummel v. St. Paul Surplus Lines Ins. Co.*, 123 N.M. 767, 771 (1997). Nonetheless, following form policies may limit the extent to which the excess policy incorporates the terms and provisions of the underlying policy. *See, e.g.*, *Hartford Accident & Indemnity Co. v. Chicago Housing Auth.*, 12 F.3d 92, 95–96 (7th Cir. 1993) (incorporating underlying policy "[e]xcept as otherwise provided by this policy"); *Coleman*, 960 F.2d at 1534 n. 9; *Home Ins. Co. v. Am. Home Products Corp.*, 902 F.2d 1111, 1113 (2d. Cir. 1990) (incorporating underlying policy "except as otherwise provided herein").

In the case at hand, the Lexington Policy clearly shows an intent to limit the extent of its coverage from the underlying policy. Most notably, the insuring clause on the first page of the policy specifically lists those sections of the underlying policy that are not incorporated; otherwise, "the provisions of the underlying policy are hereby incorporated as part of this policy." (Doc. 101, p. 5.) Additionally, on page six of the Lexington Policy under "conditions," it states that "except as herein stated," the Lexington Policy is "subject to all conditions, agreements and limitations of and shall follow the underlying policy/ies in all respects." (Doc. 101, p. 10.) Thus, the Court finds that the parties intended to limit the incorporation of terms and provisions of the underlying policy; however, in certain areas, the extent of these limitations is ambiguous.

"Ambiguities arise when separate sections of a policy appear to conflict with one another, when the language of a provision is susceptible to more than one meaning, when the structure of the contract is illogical, or when a particular matter of coverage is not explicitly addressed by the policy." *Rummel*, 123 N.M. at 758. In determining whether ambiguities exist, the Court's "focus must be upon the objective expectations that the language of the policy would create in the mind of

7

a hypothetical reasonable insured who, we assume, will have limited knowledge of insurance law." *Computer Corner*, 132 N.M. at 267; *see also St. Paul Surplus*, 123 N.M. at 771 (finding exclusion unambiguous if it "would have come to the attention of the average insured").  If an exclusion is unintelligible to a lay person or buried in the contract where the average insured would be unlikely to find it or understand its significance, the Court must find the provision ambiguous and apply the reasonable expectations doctrine. *See Pirkheim v. First Unum Life Ins.*, 229 F.3d 1008, 1011 (10th Cir. 2000) ("Where the insuring clause or exclusionary provision is conspicuous, clear, and unequivocal, we conclude application of the common law doctrine of reasonable expectations is improper."); *Roberts v. Farmers Ins. Co., Inc.*, Civ. No. 98-5234, 1999 WL 1063826, at *1–2 (10th Cir. Nov. 23, 1999) ("reasonable expectations of the parties will only be utilized after the court makes a finding that either the policy is ambiguous or the exclusion is hidden or obscured"); *Maryland Cas. Co. v. Turner*, 403 F. Supp. 907, 911–12 (W.D. Okla. 1975) (finding exclusionary clause set forth under heading "person insured" rather than under "exclusions" was ambiguous and not conspicuously set forth in policy and could not be asserted by insurer); *Computer Corner*, 132 N.M. at 267 ("It is the obligation of the insurer to draft an exclusion that clearly and unambiguously excludes coverage.").

In the case at hand, the Court finds the parties' agreement with regard to coverage for civil rights claims was ambiguous.  First, the Lexington Policy's definition of "occurrence," which Lexington argues serves to exclude civil rights violations from coverage, conflicts with the NMAC Policy's definition.  The NMAC Policy defines an occurrence broadly as "an Accident or a happening or event . . . which result [sic] in Bodily Injury, Property Damage or Personal Injury . . . ." (Doc. 76-1, p. 14); while the Lexington Policy narrowly defines an occurrence as an event that is "neither expected or intended from the standpoint of the insured." (Doc. 101, p. 10.)

8

Furthermore, this purported "definitional exclusion" was not listed in the sections on "coverage" or

"exclusions," where one would expect to find such a broad exclusion, but in the definitions section

on page five of the Lexington Policy.  Finally, the section of the NMAC Policy providing coverage

for civil rights violations ("coverage agreements") was not listed among those provisions

specifically not incorporated into the Lexington Policy. (Doc. 101, p. 5.)

> *Except as regards*: (a) the premium; (b) the obligation to investigate and defend, including costs and expenses thereto; (c) the limit of liability; (d) the renewal agreement, if any; (e) the extended reporting period provision; (f) the notice of occurrence, claim, or suit provision; (g) any other provision therein stated inconsistent with this policy; *the provisions of the underlying policy are hereby incorporated as part of this policy*.

(Doc. 101, p. 5 (emphasis added).)

The purpose of a following form excess policy is to provide additional coverage for those

risks insured by the underlying insurance policy, and if the parties did not intend to insure a specific

risk, that exclusion must be conspicuous.  For example, the Lexington Policy specifically excludes

coverage for several forms of personal and property injury covered by the NMAC Policy in the

"exclusions" section. (Doc. 101, p. 8–9.)  Civil rights violations, however, are not listed among the

exclusions.  As civil rights are specifically listed as a covered risk in the underlying policy, the Court

is reluctant to exclude them pursuant to a general exclusionary definition. *See Western Oil Fields,*

*Inc. v. Pennzoil United, Inc.*, 421 F.2d 387, 389 (5th Cir. 1970) ("It is well settled that a special or

more particular clause must prevail over a general clause.").  If Lexington intended to exclude all

civil rights claims from coverage, it could have used a more unambiguous means to do so. *Baker*

*v. Armstrong*, 106 N.M. 395, 396 (1987) (finding that "rich and resourceful as is the English

language," the insurer could have found more explicit ways to construct an exclusion).  In the end,

"[i]t is the obligation of the insurer to draft an exclusion that clearly and unambiguously excludes

coverage." *Computer Corner*, 132 N.M. at 266; *Rodriguez v. Windsor Ins. Co.*, 118 N.M. 127, 131 (1994) (" '[T]he insurer has a duty to make any [limitations of or] exclusions from coverage both clear and conspicuous.  Any limitations should be so written that the insured, by reading the policy, can understand what the exclusions are, when they are given a reasonable and fair interpretation.' " (quoting 13 JOHN A. APPLEMAN & JEAN APPLEMAN, INSURANCE LAW AND PRACTICE § 7403, at 318–20 (1976) (footnotes omitted))).

In the end, the Court finds the Lexington Policy ambiguous as to whether it excludes civil rights violations.  When resolving ambiguities in an insurance contract, a "court's construction of an insurance policy will be guided by the reasonable expectations of the insured," and any ambiguities "construed against the insurer." *Rummel*, 123 N.M. at 759; *see also Battishill v. Farmers Alliance Ins. Co.*, 139 N.M. 24, 28 (2006) ("it is the law in New Mexico that an insurance policy which may reasonably be construed in more than one way should be construed liberally in favor of the insured" (internal quotations omitted)); *Knowles*, 113 N.M. at 705 ("Exclusionary clauses in insurance policies are to be narrowly construed with the reasonable expectations of the insured providing the basis for our analysis." (internal citations omitted)); *Federal Ins.*, 113 N.M. at 169 (finding that where an exclusionary clause is "repugnant" to the insuring clause of the policy, "a court may and indeed should . . . , refuse to apply the clause that deprives the insured of the insurance coverage which the insured reasonably understood was afforded by the policy for which premiums were paid").  Accordingly, the Court finds that Defendants had a reasonable expectation of coverage for civil rights violations, and the exclusionary definition does not function to exclude civil rights violations from coverage.

2.     *Claims Arising Under the New Mexico Tort Claims Act*

The *Lira* plaintiffs' second cause of action (Claims Arising Under the New Mexico Tort

Claims Act) alleged that the detainees suffered "personal injury and bodily injury . . . resulting from assault, battery, false imprisonment, and/or deprivation of rights, privileges or immunity [sic] secured by the Constitution and laws of the United States and New Mexico." (*Lira* Compl. ¶ 63.) The Court finds that the New Mexico Tort Claims Act exclusion in the Lexington Policy (Doc. 101, p. 36) was clear and unambiguous and should therefore be enforced.  Accordingly, the Court finds that any claims arising out of the *Lira* plaintiffs' second cause of action were not covered by the Lexington Policy.

### 3.     Claims for Injunctive or Declaratory Relief

In their third cause of action, the *Lira* plaintiffs' requested that the Court enjoin Defendants from conducting any further strip searches without individualized reasonable suspicion.  Lexington argues that any claims seeking injunctive or declaratory relief are not covered because its policy only provides coverage for compensatory damages.  Indeed, the Lexington Policy clearly states that it will pay "compensatory damages" (Doc. 74-1, p. 21), and the NMAC Policy states that it will pay "money damages." (Doc. 76-2, p. 1.)  Thus, neither policy provides coverage for injunctive, declaratory, or other forms of equitable relief.  *See Cont'l Ins. Cos. v. Northeaster Pharm. & Chem. Co., Inc.*, 842 F.2d 977, 986 (8th Cir. 1988) ("Black letter insurance law holds that claims for equitable relief are not claims for damages under liability insurance contracts."); *Md. Cas. Co. v. Armco, Inc.*, 643 F. Supp. 430, 434 (D. Md. 1986) ("Traditionally, courts have found no insurance coverage for the costs of complying with an injunction even in cases where the suits could have been brought for damages.").

Notwithstanding, the *Lira* plaintiffs' only requested that Defendants be enjoined from conducting "strip searches without individualized reasonable suspicion." (*Lira* Compl. ¶ 72.)  This requested relief does not appear to have been part of the monetary damages awarded to the *Lira*

plaintiffs under the settlement agreement.  Indeed, the *Lira* complaint states that "[n]o cognizable burden will be placed on Defendants by requiring that no strip searches be undertaken without individualized reasonable suspicion." (*Lira* Compl. ¶ 75.)  Furthermore, Defendants stipulated in the settlement agreement that the strip search policy at the detention center had been discontinued as a result of the lawsuit, and therefore, "the request for equitable relief was thereby rendered moot." (Stipulation of Settlement ¶ 21.)  Thus, while Lexington may not be liable for any damages attributed to this third cause of action, based on the complaint and the settlement agreement, it does not appear that any damages were allocated to this third cause of action.

### 4.    *Exclusion of Fines, Penalties, Punitive, and Exemplary Damages*

Lexington next argues that its policy excludes coverage for punitive damages and attorneys' fees.  The insuring clause of the Lexington Policy states that the insurer "will pay on behalf of the Insured that portion of the loss which the Insured will become legally obligated to pay as compensatory damages (excluding all fines, penalties, punitive or exemplary damages) . . . ." (Doc. 74-1, p. 21.)  The Court finds that this exclusion was conspicuous (located in the first paragraph on the first page of the policy under "coverage") and that the language is clear and unambiguous; therefore, the exclusion should be enforced. *See St. Paul Surplus*, 123 N.M. at 771. Consequently, the Court finds punitive damages were excluded from coverage.

Lexington also argues that this clause excludes coverage for the $1,666,667.00 in attorneys' fees awarded to the *Lira* plaintiffs' because attorneys' fees do not constitute compensatory damages. Attorneys' fees "are ancillary to damages and therefore not part of the substantive claim." *Scottsdale Ins. Co. v. Haynes*, 793 So.2d 1006, 1009 (Fla. Dist. Ct. App. 2001); *see also Tatavich v. Pettine*, 31 N.M. 479 (1926); *Superintendent of Ins. v. Mountain States Mut. Cas. Co.*, 104 N.M. 605, 606 (N.M. Ct. App. 1986).  Defendants counter that if Lexington intended to exclude attorneys' fees

12

from coverage, it should have done so through an express exclusion, as the NMAC Policy specifically cover "attorneys' fees and costs." (Doc. 76-1, p. 14.) Furthermore, the Lexington Policy provides coverage for any "loss which the Insured will become legally obligated to pay as compensatory damages;" the word "loss" is then defined to include "all expenses and costs," and "costs" is defined to include "legal expenses." (Doc. 74-1, pp. 21, 25–26.)

Generally, each party must pay his or her own attorneys' fees, and absent a specific statute or rule of court authorizing the recovery of attorneys' fees, they are not included as damages. *Superintendent of Ins.*, 104 N.M. at 606. Thus, Lexington is correct that attorneys' fees do not generally fall under the category of compensatory damages. So, the logical interpretation of "legal expenses," from a legal perspective, is that the policy only provides for the payment of the Defendants' legal expenses. In determining whether a contract is ambiguous, however, a court must look at the language of the contract from the perspective of a layman, not a lawyer.

> In determining the existence of an ambiguity, the language at issue should be considered not from the viewpoint of a lawyer, or a person with training in the insurance field, but from the standpoint of a reasonably intelligent layman, viewing the matter fairly and reasonably, in accordance with the usual and natural meaning of the words, and in light of existing circumstances, prior to and contemporaneous with the making of the policy.

*Rummel*, 123 N.M. at 758; *see also Computer Corner*, 132 N.M. at 267.

From a lay perspective, "legal expenses" could be interpreted to mean all attorneys' fees, including the opposing party's fees. Considering that attorneys' fees were clearly covered under the NMAC Policy, this is a logical interpretation, and where there are multiple interpretations to an insurance contract, the policy must be interpreted in favor of the insured. *Battishill*, 139 N.M. at 28. Therefore, the Court finds that attorneys' fees were covered under the parties' agreement.

13

5.      *Discrimination & Humiliation Exclusion*

Lexington next argues its "discrimination and humiliation" exclusion (Doc. 74-1, p. 25) excludes coverage for all the *Lira* plaintiffs' civil rights claims because the plaintiffs alleged they suffered humiliation. (*Lira* Compl. ¶ 78.)  Defendants counter that the allegation of humiliation was only included in the damages section of the complaint and should not support a blanket denial of coverage.  There is no question that the *Lira* plaintiffs were likely humiliated by the strip searches; however, the Lexington Policy did not define humiliation, and, as it is listed with discrimination, it was likely intended to apply only to humiliation associated with religious, sexual, racial, or other recognized forms of discrimination.  Additionally, the definition conflicts with the NMAC Policy, which provides coverage for several acts that could be considered humiliating—including sexual harassment, invasion of privacy rights, libel, slander, defamation, erroneous service of civil papers, and civil rights violations. (Doc. 76-1, pp. 14–16.)  Consequently, the term is ambiguous and must be interpreted in favor of the insured. *Battishill*, 139 N.M. at 28.  Thus, this exclusion does not support a blanket denial of coverage for civil rights violations.

6.      *Abuse & Molestation Exclusion*

Lexington next argues that its "abuse and molestation" exclusion (Doc. 74-1, p. 30) excludes coverage for all civil rights claims.  Lexington argues that in its common, ordinary usage "to abuse" means "to mistreat" and encompasses the strip searches of the *Lira* plaintiffs.  Like humiliation, however, the term "abuse" could apply to any number of civil rights violations and is not defined in the Lexington Policy.  The fact that "abuse" is listed with the term "molestation" indicates that it refers to "sexual" abuse and molestation.  In its common and ordinary usage, molestation refers to "sexual" molestation; therefore, when read in context, the Court understands abuse to refer to "sexual" abuse.  Additionally, sexual abuse is covered by the NMAC Policy and defined therein to

include "sexual molestation." (Doc. 76-1, p. 16.)

Furthermore, of the cases cited by Lexington that dealt with "abuse," all of them, except for *Neff ex. rel Landauer v. Alterra Healthcare Corp.*, dealt with "sexual" abuse; and while the court in *Neff* found that the exclusion applied, it noted that the appellant did not contest the issue of whether the injuries constituted "abuse" within the meaning of the insurance policy. 271 Fed. Appx. 224, 226 n. 4 (3d Cir. 2008). Thus, the issue was not disputed. Finally, if the Court were to define "abuse" or "humiliation" broadly, as Lexington proposes, these exclusions would swallow up almost every other provision in the parties' agreement, as every civil rights violation, tort, or personal injury would arguably represent a form of abuse or humiliation. Therefore, the Court finds these exclusions do not exclude coverage for the *Lira* plaintiffs' civil rights claims.

### C.     Allocation and the Concurrent Claims Doctrine

Having determined that Lexington has a duty to provide coverage for civil rights violations, but that it was not liable for claims arising under the New Mexico Tort Claims Act or punitive damages, the Court now considers how, or if, to allocate the settlement between covered and non-covered items. The fact the Stipulation of Settlement (Doc. 74-2) does not allocate monies between the *Lira* plaintiffs' causes of action or between types of damages makes this inquiry complicated. The only allocations made with regard to the $5,000,000 settlement were $175,000.00 for the named plaintiffs and $1,666,667.00 for the *Lira* plaintiffs' attorneys' fees. (Stipulation of Settlement ¶ 30.)

Lexington argues that because Defendants failed to allocate, they are at fault and must forfeit their right to recover any funds: "Because Lexington did not control the defense of the underlying lawsuit, the burden of proof is on the insured to allocate between covered and non-covered items, and if the insured fails to take steps to allocate a settlement or judgment between covered and non-covered items, it forfeits its right to any recovery from the carrier." (Doc. 74, p. 21.) While this

reasoning is persuasive under certain circumstances, the Court is not convinced it applies in the case at hand because Defendants did not exclude Lexington from participation in their defense, the settlement negotiations, or in drafting the settlement agreement; rather, Lexington chose not to participate because it believed it was not liable under the terms of its policy. *See Bunge Corp. v. London & Overseas Ins. Co.*, 394 F.2d 496, 497 (2d Cir. 1968) ("It is well settled that, at least after a denial of liability by an insurer, the insured may enter into a settlement with a third party without prejudicing its rights against the insurer."); *Rummel*, 123 N.M. at 766 ("Despite the insurer's good faith belief that there is no coverage, if the court finds coverage upon construction of the insurance contract, then the insurer will be bound by the settlement."); *State Farm Mut. Auto. Ins. Co. v. Paynter*, 593 P.2d 948, 951 (Ariz. Ct. App. 1979) ("[A]n abandoned insured may enter into a reasonable agreement limiting his liability in order to avoid litigation of the claim at his own expense.").  When Defendants sent Lexington notice of a possible insurance claim resulting from the *Lira* plaintiffs' class action, Lexington responded with two reservation of rights letters (Docs. 22-1 & 22-2) denying liability for the *Lira* claims and indicating that they were not taking any action.  Furthermore, at the time Defendants entered into the settlement agreement, Lexington had already filed its Complaint for Declaratory Judgment (Doc. 1) in this action.  Therefore, there was a clear and unequivocal denial of coverage by the insurer.

This situation is distinct from the case where the defendant in the underlying lawsuit refuses to allow the insurer to defend the case on the insured's behalf or to participate in settlement proceedings. *See Martin v. W. Amer. Ins. Co.*, 128 N.M. 446, 450 (N.M. Ct. App. 1999) ("[B]ecause Insurer was in fact defending when Insured entered into the settlement, we hold that . . . Insurer was not required to indemnify Insured for a settlement made without requesting its consent.").  In that case, the defendant should not benefit by failing to allocate between claims and then asserting that

the insurance company must pay the entire jury award or settlement.  When the insurer provides the defense, the insurer has a duty to provide a special verdict form or interrogatory to properly allocate the jury's verdict between the covered and non-covered causes of action.  *See Magnum Foods, Inc. v. Cont'l Cas. Co.*, 36 F.3d 1491, 1498–99 (10th Cir. 1994).  Likewise, where a defendant chooses to provide his own defense or excludes the insurer from the settlement proceedings, he logically has a corresponding duty to protect the interests of the insurer, which is not in the position to do so itself. The Tenth Circuit case, *Magnum Foods*, dealt with the situation where the insurer provided the defense and then failed to properly allocate damages.  Its reasoning is instructive:

> *The right to control the litigation carries with it certain duties*.  One of these is the duty not to prejudice the insured's rights by failing to request special interrogatories or a special verdict in order to clarify coverage of damages.  The reason for this is that when grounds of liability are asserted, some of which are covered by insurance and some of which are not, a conflict of interest arises between the insurer and the insured.  If the burden of apportioning damages between covered and non-covered were to rest on the insured, who is not in control of the defense, the insurer could obtain for itself an escape from responsibility merely by failing to request a special verdict or special interrogatories.  The *insurer is in the best position to see to it that the damages are allocated*; therefore, it should be given the incentive to do so.

*Id*. (emphasis added).

In the case at hand, Lexington chose not to participate in the insured's defense, and while it participated in part of the settlement negotiations, it abandoned the proceedings after two days. (Doc. 76-1, Kopelman Aff. ¶ 15; Doc. 78-1.)  Defendants kept Lexington apprised of developments throughout the proceedings and invited the insurer to participate in the negotiations, but Lexington never raised the issue of allocation during the proceedings, in the Mutual Reservation of Rights and Agreement to Fund Settlement, or in its Complaint for Declaratory Judgment.  Consequently, Lexington should be estopped from denying liability based on a failure to allocate because the insurer failed to address this issue, even though it was aware of the problem, had the opportunity to

17

object, and was in the best position to do so.  Instead, Lexington relied on its interpretation of the parties' agreement to shield it from liability; and therefore, its liability should depend on the Court's determination of coverage under the policy.

Defendants additionally assert that the concurrent claims doctrine applies and mandates coverage for the entire settlement.  Under the concurrent claims doctrine, an insurer may be found liable to provide coverage for all claims where a loss can be attributed to more than one cause of action. *See Valley Bancorp. v. Auto Owners Ins. Co.*, 569 N.W.2d 345, 349 (Wis. Ct. App. 1997). Defendants argue that Lexington is liable for the entire settlement in excess of its primary policy coverage limits because, as long as one of the claims is covered by the policy, coverage applies to all claims. *See Allstate Ins. Co. v. Blount*, 491 F.3d 903, 911 (8th Cir. 2007) (finding that when "each alleged cause could have independently brought about the injury," insurer is liable so long as one of the causes is covered by the policy); *Zurich Specialties London Ltd. v. Bickerstaff, Whatley, Ryan & Burkhalter, Inc.*, 650 F. Supp. 2d 1064, 1071 (C.D. Cal. 2009) ("when a harm is caused jointly by an insured risk and by an excluded risk . . . the insurer is liable so long as one of the causes is covered" (internal citations and quotations omitted)).  In the end, "[i]t is the underlying conduct and not the label that is attached that determines insurance coverage." *Valley Bancorp.*, 569 N.W.2d at 349.  Since the same alleged conduct—the County Board's and supervisors' failure to stop unlawful strip searches—constituted a cause of action under both the New Mexico Tort Claims Act and under 42 U.S.C. § 1983, Lexington may be held liable for the entire settlement in excess of the Defendants' primary insurance coverage. *Id.*

In *Rummel*, the New Mexico Supreme Court warned that an insurance "company should always seriously evaluate a demand or a request by its insured that it participate in negotiations." 123 N.M. at 766.  Clearly the "interpretation of an insurance contract is a matter of law about which

the court has the final word," and even though the company may believe that the language of the policy limits its liability, a court may disagree. *Id*. By abandoning the settlement proceedings and not participating in the drafting of the settlement agreement, Lexington missed the opportunity to limit its liability; therefore, it should not now be able to escape liability by asserting that Defendants are at fault for failing to allocate between claims. Accordingly, the Court finds that Lexington breached its insurance contract with Defendants and is liable to provide coverage up to its policy limits for that portion of the settlement in excess of the Defendants' primary insurance coverage.

### D.    Defendants' Counterclaim

In their Counterclaim (Doc. 10), Defendants argue that by failing to provide a prompt, fair, and equitable settlement of their claims, Lexington breached the parties' insurance contract, as well as its statutory and common law duty to act in good faith. Defendants assert that Lexington's breach of the insurance contract and its duty of good faith was willful and intentional; therefore, Defendants argue they are entitled to attorneys fees, costs, and punitive damages, in addition to compensatory damages for breach of contract.

Under New Mexico law, insurance contracts are treated differently than ordinary commercial contracts, and the insured and insurer are deemed to have a special relationship: the insurer has a common law and statutory duty to act in good faith. *See Suggs v. State Farm Fire and Cas. Co.*, 833 F.2d 883, 890 (10th Cir. 1987); N.M. STAT. § 59A-16-20; *State Farm Mut. Auto. Ins. Co. v. Fenema*, 137 N.M. 275, 279 (2005). Under New Mexico Statute § 59A-16-20(A), an insurer may not misrepresent "pertinent facts or policy provisions" relating to the coverage of the insured. Additionally, under New Mexico Statute § 59A-16-20(E), an insurer is prohibited from failing to act "in good faith to effectuate prompt, fair and equitable settlements of an insured's claims in which liability has become reasonably clear." Defendants claim that Lexington breached its duty of good

faith by misrepresenting to them that certain policy exclusions precluded coverage of the *Lira* plaintiffs' claims and by refusing to pay its policy limits on the *Lira* plaintiffs' claim.

Bad faith is defined as "a frivolous or unfounded refusal to pay" by the insurer. *Suggs*, 833 F.2d at 890.  Under New Mexico law, this means that for the insured to show bad faith, the insurer must have had "no reasonable basis for denying an insured's claim." *Yumukoglu v. Provident Life & Acc. Ins. Co.*, 131 F. Supp. 2d 1215, 1226 (D.N.M. 2001) (quoting *Winters v. Transam. Ins. Co.*, No. Civ. 98-2000, 1999 WL 699835 at *4 (10th Cir. Sept. 9, 1999)); *see also Jackson v. Nat'l Life Ins. Co. v. Receconi*, 113 N.M. 403, 419 (1992).  Because Lexington's denial of coverage was based on ambiguities in the parties' contract, the Court finds that Lexington's denial of coverage was not unfounded, frivolous, or in bad faith.  Thus, Defendants are not entitled to an award of punitive damages or attorneys' fees in the present action. *See Suggs*, 833 F.2d at 893 (finding that under New Mexico law, insured is only entitled to attorneys' fees where insurer acted unreasonably or in bad faith); *McGinnis v. Honeywell, Inc.*, 110 N.M. 1, 9 (1990) (finding that "[t]he mere breach of a contract does not itself create a right to punitive damages"); *United Nuclear Corp. v. Allendale Mut. Ins. Co.*, 103 N.M. 480, 485 (1985) ("To assess punitive damages for breach of an insurance policy there must be evidence of bad faith or malice in the insurer's refusal to pay the claim."); NMSA § 39-2-1 ("insured person may be awarded reasonable attorney's fees and costs of the action upon a finding by the court that the insurer acted unreasonably in failing to pay the claim").

Additionally, Defendants are not entitled to prejudgment interest or other compensatory damages on their counterclaim.  Under New Mexico Law, prejudgement interest is owed as a matter of right where the damages are fixed and ascertainable. *Taylor v. Allegretto*, 118 N.M. 85 (1994); *United Nuclear Corp. v. Allendale Mut. Ins. Co.*, 103 N.M. 480, 488 (1985).  In the case at hand, however, the damages were not fixed or ascertainable until the court found Lexington had breached

20

its contract with the insured; therefore, prejudgment interest is not appropriate. *See City of Hobbs v. Nutmeg Ins. Co.*, 2000 U.S. App. LEXIS 31144, at *16–18 (10th Cir. Nov. 30, 2000); *State Farm v. Blystra*, 1997 U.S. App. LEXIS 27145, at * 4–7 (10th Cir. Oct. 2, 1997).  As Defendants have not asserted or established a factual basis for any damages beyond those already discussed, the Court concludes that Defendants sustained damages of $1,325,000, the amount it paid toward settlement of the *Lira* case. *See Simplot v. Chevron Pipeline Co.*, 563 F.3d 1102, 1116 (10th Cir. 2009) (finding district court correctly granted summary judgment on issue of damages where there were no genuine issues of material fact).

### E.    Lexington's Request for Attorneys' Fees

In its Complaint for Declaratory Judgment, Lexington asks for an award of "reasonable and necessary attorneys' fees and expenses" as this would be "equitable and just." (Lexington Compl., ¶ 40.)  Under the "American Rule," however, in the absence of a specific statute or enforceable contract, litigants must pay their own attorneys' fees. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 256 (1975).  In New Mexico, there also exists a bad-faith exception to the American Rule, where a court may award attorneys' fees to "compensate the prevailing party for expenses incurred as a result of frivolous or vexatious litigation." *New Mexico* ex rel. *v. Baca*, 120 N.M. 1, 5 (1995); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991).  Lexington has not shown, however, that Defendants acted in bad faith or that their counterclaim was frivolous or vexatious; therefore, the Court finds that Lexington is not entitled to attorneys' fees in this action.

## V.    CONCLUSION

The *Lira* plaintiffs' civil rights claims are not excluded from coverage under the Lexington Policy, as the average insured would not have understood the policy to exclude all civil rights violations from coverage.  A following form policy must follow the terms of the primary policy,

except where the excess policy specifically provides otherwise; therefore, the burden is on the insurer to carefully draft its policy exclusions.  In the case at hand, the parties' insurance contract was ambiguous; consequently, Defendants had a reasonable expectation of coverage.  Additionally, the Lexington Policy's  "discrimination and humiliation" and "abuse and molestation" exclusions do not support a blanket denial of coverage for civil rights claims as they were also ambiguous, and the Court must enforce the Defendants' reasonable expectations.  Were the Court to interpret these terms broadly, as urged by Lexington, they would swallow up almost every other provision in the parties' agreement.  Finally, the Court finds that Lexington should not escape liability by asserting that Defendants failed to allocate between claims in the settlement agreement when it was at least equally at fault.  Accordingly, Lexington must provide coverage up to its policy limits for that portion of the settlement in excess of the Defendants' primary insurance coverage; however, its denial of coverage was not unfounded or frivolous, and therefore, it is not liable for punitive damages or Defendants' attorneys' fees in this action.


**WHEREFORE,**

    **IT IS HEREBY ORDERED** that Lexington's Motion for Summary Judgment (Doc. 74), is GRANTED IN PART and DENIED IN PART, and Defendants' Motion for Summary Judgment (Doc. 75) is GRANTED IN PART and DENIED IN PART.


_____
**ROBERT BRACK**
**U.S. DISTRICT COURT JUDGE**